FILED IN CHAMBERS
U.S.D.C. Atlanta

MAY 1 5 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ADVANCED TELEMEDIA, L.L.C.,

        Plaintiff,

    v.

CHARTER COMMUNICATIONS, INC,

        Defendant.

CIVIL ACTION

NO. 1:05-CV-2662-RLV

## O R D E R

This is a breach of contract action in which the plaintiff also asserts a number of other state law causes of action. This matter comes before the court on the plaintiff's motion to compel [Doc. No. 27].

### I. Factual Background

In 1998 and 2000, Advanced TeleMedia, LLC ("ATM") and Charter Communications, Inc. ("Charter") entered into five written agreements ("Agreements"). These Agreements dealt with the provision of Charter's cable television service at five metropolitan Atlanta apartment complexes which include the Berkeley Landing Apartments, Riverbend Apartments, Cumberland Glen Apartments, Wexford Hills Apartments, and Lincoln Trace Apartments (collectively known as the "Properties").

ATM alleges that in 1998 and 2000 it assigned to Charter its license right to provide ancillary services, such as digital cable, premium programming, pay-per-view and high speed internet to

residents of the Properties.  However, ATM alleges that it retained the exclusive right to provide basic cable services to the residents of the Properties.  According to ATM, ATM paid Charter a monthly service charge per unit in exchange for Charter's obligation to allow ATM to continue as the exclusive provider of basic cable service at the Properties.  ATM alleges that during pendency of its Agreements with Charter that Charter consistently provided basic cable services to the residents of the Properties in violation of ATM's rights under the Agreements.[1]  ATM alleges that it incurred damages as the result of Charter's breach of its Agreements with ATM.

On December 6, 2005, ATM served its First Request for Production of Documents on Charter.  ATM sought, among other things, documents related to Charter's provision of basic cable services to the residents of the Properties.  In response to ATM's requests, Charter produced invoices and billing records from

---

[1] On October 14, 2005, ATM filed its complaint [Doc. No. 1]. On January 27, 2006, ATM filed its First Amended Complaint [Doc. No. 19].  On January 9, 2006, the parties filed a stipulation wherein the parties agreed that ATM would be allowed to file an Amended Complaint [Doc. No. 16].  The First Amended Complaint includes eight enumerated Counts.  Specifically, ATM alleges that Charter (1) engaged in unauthorized reception of cable service in violation of 47 U.S.C. § 553(A)(1); (2) engaged in unauthorized publication or use of communications in violation of 47 U.S.C. § 605; (3) breached its contractual Agreements with ATM; (4) committed fraud; (5) engaged in conversion; (6) tortiously interfered with ATM's prospective business relations; and (7) unjustly enriched itself.  Lastly in Count Eight, ATM seeks reimbursement for the expenses incurred in bringing this suit.

2

February 2003 to the termination dates of the Agreements.  However,

Charter refused to produce any documents prior to February 2003.[2]

Thereafter, a discovery dispute ensued.

On February 20, 2006, ATM filed a motion to compel demanding

that Charter (1) produce the customer data related to the

Properties prior to February 2003 or (2) allow ATM or a neutral

expert to inspect Charter's computer records.  On March 13, 2006,

_____

[2] Specifically, ATM argues that Charter has failed to
completely satisfy the following document requests.

9. All documents regarding your billing of each and every
Subscriber, including but not limited to billing records,
invoices, and subscriber databases, for any and all
services provided to such Subscriber.

10. Any and all back-up tapes containing information
relating to Subscribers or Subscriber Accounts.

18. All documents showing your Subscriber count by month
for each of the Properties from date of execution of the
Contracts to the present.

22. All documents relating to the installation,
connection, reconnection or change in service by any
Subscriber at any of the Properties.

24. Any and all documents evidencing, concerning, or
relating to the enrollment of any resident at the
Properties.

25. Any and all invoices, bills, or any other document
used to bill your Subscribers at the Properties.

27. Any and all documents evidencing, concerning, or
relating to the number of Subscribers or residents
serviced at each of the Properties by month during the
relevant time period.

37. All database storing Subscriber or Subscriber Account
information.

the court approved the parties' joint consent motion dealing with the confidentiality of customer invoices [Doc. No. 38].

In its response to ATM's motion to compel, Charter argues that ATM's requests are not only irrelevant to the instant litigation but are also protected from disclosure by 47 U.S.C. § 551(c).[3]

_____

[3] 47 U.S.C. § 551 deals with the protection of cable service subscriber privacy.  The pertinent provisions provide:

(b) Collection of personally identifiable information using cable system.

(1) Except as provided in paragraph (2), a cable operator shall not use the cable system to collect personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned.

(2) A cable operator may use the cable system to collect such information in order to--

(A) obtain information necessary to render a cable system or other service provided by the cable operator to the subscriber; or

(B) detect unauthorized reception of cable communications.

(c) Disclosure of personally identifiable information

(1) Except as provided in paragraph (2), a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned and shall take such actions as necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator.

(2) A cable operator may disclose such information if the disclosure is--

(A) necessary to render, or conduct a legitimate business activity related to, a cable service or other service

4

Specifically, Charter has objected to the production of the customer invoices prior to February 2003 on three grounds.  First, Charter argues that the request would be unduly burdensome because the production of the Properties' customer invoices would require the examination of millions of micro-fiche documents in search of approximately 50,000 potentially relevant documents.   Second, Charter argues that the request is overbroad because ATM's request requires the production of a colossal amount of unrelated customer invoices, which are protected from disclosure by 47 U.S.C. § 551(c).   Third, Charter argues, "Charter employees and hired temporary workers have previously expended 250 hours producing 20,000 pages of documents which ATM can utilize to calculate all of

---

provided by the cable operator to the subscriber;

(B) subject to subsection (h) of this section, made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed;

(C) a disclosure of the names and addresses of subscribers to any cable service or other service, if--

(i) the cable operator has provided the subscriber the opportunity to prohibit or limit such disclosure, and

(ii) the disclosure does not reveal, directly or indirectly, the--

(I) extent of any viewing or other use by the subscriber of a cable service or other service provided by the cable operator, or

(II) the nature of any transaction made by the subscriber over the cable system of the cable operator.

its alleged damages."

## II. Legal Analysis
### A. Motion to Compel the Production of
### Customer Invoices Prior to February 2003

The scope of discovery is governed by Rule 26 of the Federal Rules of Civil Procedure.  Rule 26(b)(1) allows discovery regarding any manner, not privileged, that is relevant to the subject matter of the pending litigation.  The term "relevant" is to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that bears on, any issue that is or may be in the case. Oppenheimer Fund Inc., v. Sanders, 437 U.S. 340, 351 (1978).  While the scope of discovery is broad, it is not without its limits.  Id. at 351-52.  "Discovery of matter 'not reasonably calculated to lead to discovery of admissible evidence' is not within the scope of Rule 26(b)(1)." Id. at 352.

Discovery requests that are otherwise reasonable may also be limited for the following reasons:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had the ample opportunity by discovery in the action to obtain the information sought; or

> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2).

The onus is on the party resisting discovery, i.e., Charter, to demonstrate specifically how the objected-to request is unreasonable or otherwise burdensome. <u>See Panola Land Buyers Ass'n v. Shuman</u>, 762 F.2d 1550, 1559 (11th Cir. 1985). Therefore, Charter will have to demonstrate that each of ATM's discovery requests are either unreasonable or burdensome.

In its response to ATM's motion to compel, Charter focuses the thrust of its argument against the production of the customer invoices requested by ATM on the grounds that such production would be burdensome and in violation of 47 U.S.C. § 551(c). With regard to the customer invoices prior to September 2002, Charter argues that searching for an estimated 50,000 invoices out of over 2,000,000 invoices which are only on micro-fiche is unduly burdensome and would take over two years to perform. Additionally, Charter argues that even if ATM was willing to perform the task of reviewing the micro-fiche records itself, Charter would have to produce a large amount of customer records which are not related to this suit and are protected from disclosure by 47 U.S.C. § 551(c). With regard to the electronic records between October 2002 and January 2003, Charter argues that it maintains a CD-ROM of approximately 320,000 customer invoices for the period and it is impossible to extract only the ATM invoices from the CD-ROM. Like the documents for the period prior to September 2002, Charter

argues that production of the CD-ROM, which includes the customer information of individuals unrelated to the ATM suit and the production of this customer information would potentially violate 47 U.S.C. § 551(c).

Charter also argues that ATM has a less burdensome method for calculating damages for the months prior to February 2003. Charter argues:

> ATM can utilize the 20,000 invoices previously produced by Charter to calculate its damages over the life of the contract. A sample size of 20,000 is more than adequate to accurately gauge the extent of ATM's alleged damages.[4]

As a preliminary matter, the court concludes that the customer invoices requested by ATM for the Properties for both the period prior to September 2002 and for the period from October 2002 to

---

[4] An attorney representing ATM originally proposed a similar method for calculating damages in a letter dated September 2, 2004. This letter was composed and prepared by ATM's counsel prior to filing this suit. According to the September 2, 2004, letter from Alison P. Danaceau, an attorney for ATM, to Michael D. Bokermann, an attorney for Charter, Danaceau proposed:

> Alternatively, in order to resolve this matter timely, we offer a compromise. We are prepared to rely upon empirical data to ascertain the actual damages sustained by [ATM].

In the September 2, 2004, letter, Danaceau stated, "ATM lost revenue of not less than $570,445.20 due to Charter's breaches."

Additionally, ATM demonstrated that it had a method for calculating its damages on Pages 5-6 of its reply brief "based upon known empirical data." In its reply brief, ATM argues that it needed the customer information requested by the current motion to compel to "cross-reference" its estimation of damages.

January 2003 are relevant to ATM's claims and damages.  However, the court finds that there are two distinct subsets of customer invoices that are the subject to ATM's motion to compel: (1) the customer invoices prior to September 2002, which are only on micro-fiche and (2) the customer invoices between October 2002 and January 2003, which are on a CD-ROM disc.  Each of these distinct subsets of customer records must be examined separately because the court finds that the burdens and costs associated with the production of each subset differ significantly.

Charter's production of the customer invoices for the Properties for the time-period between October 2002 and January 2003 which are on CD-ROM can be produced without unduly burdening Charter.  Therefore, the court directs Charter to produce the customer invoices for the period between October 2002 and January 2003 for the Properties in question to ATM within 60 days of the date this order is docketed.  In deciding to require Charter to produce the customer invoices for the time-period from October 2002 to January 2003, the court placed great significance on the fact that the parties entered a joint confidentiality agreement regarding customer invoices and the information contained in such invoices. Any legitimate concerns articulated by Charter regarding possible 47 U.S.C. § 551 violations are addressed and mooted by the parties' joint confidentiality agreement and by the fact that Charter is to conduct the search of its own customer records.

9

Thereafter, Charter is to submit only customer information to ATM which complies with 47 U.S.C. § 551(c)'s disclosure requirements.

With regard to the production of customer invoices for the time period prior to September 2002 which are only on micro-fiche, the court concludes these customer invoices for this period are also relevant to ATM's claims and damages.  However, Charter's production of the customer invoices for the period of time prior to September 2002 would be needlessly burdensome and time-consuming for Charter to produce.

In reaching the conclusion that the court will not compel Charter to produce the customer invoices for the period prior to September 2002, the court placed significant emphasis on the fact that ATM can estimate its damages without the production of these customer invoices.  In fact, Charter agreed in its response brief that it would allow ATM to estimate its damages using the customer invoices Charter already produced for the time period from February 2003 to the end of the Agreement period.  In addition to the customer invoices already produced by Charter for the period from February 2003 to the end of the Agreement period, the court notes that it would allow ATM to estimate its damages arising from Charter's alleged breach from the customer invoices that the court has directed Charter to produce in this order for the time period

between October 2002 and January 2003.[5]   Therefore, the court denies ATM's motion to compel to the extent that the motion seeks to compel the production of customer invoices for the period prior to September 2002.[6]

As an alternative to or a supplement to Charter's production of the customer invoices, ATM also requested that the court allow either it or a neutral third-party to engage in an inspection of Charter's computer records.   ATM argues that an inspection of Charter's computer records would allow it to determine whether Charter's records can be manipulated to generate a computer list of customers by location, customer, or date.   However, the court will

---

[5]ATM has submitted the deposition of Jones Robert Bridges, who is purportedly the Charter employee responsible for overseeing the Agreements at issue in this suit.   In its reply brief, ATM argues that Charter admitted that it had breached its Agreements with ATM. However, the court did not consider this information.   On a motion to compel, the court considers the scope of discovery, not whether the parties are liable for any breach.

[6] If ATM finds that it cannot or is unwilling to estimate its damages without the customer invoices on the Proprieties for the period prior to September 2002, the court directs ATM to reimburse Charter for the costs incurred in Charter's micro-fiche search for and the production of the customer invoices for this period.   The parties should follow the below procedure if ATM persists in its demand for the customer invoices prior to September 2002.   Within 20 days of the date of this order, Charter is to produce a good-faith estimate of the costs for the micro-fiche search for and the eventual production of the customer invoices for the period prior to September 2002 to ATM.   If ATM continues to demand the production of the customer invoices for the period prior to September 2002 after reviewing Charter's good-faith estimate of the costs involved in producing said customer invoices, ATM is directed to deposit into the registry of the court the amount that Charter has estimated that it would cost to search for and produce these customer invoices.

not allow either ATM or a neutral third-party to conduct such an inspection. An inspection by ATM or a neutral third party of Charter's customer records would potentially violate 47 U.S.C. § 551(c). An inspection by ATM or a neutral third-party would potentially expose the private customer information of thousands and/or millions unrelated to this suit to disclosure. Therefore, the court declines to allow either ATM or a neutral third-party to engage in an inspection of Charter's computer records.

### B. Charter's Motions for a Protective Order and Attorneys Fees

In its response to ATM's motion to compel, Charter requested that the court enter a protective order regarding the customer invoices in question and award Charter its attorneys fees pursuant to Rule 26(c) and 37 for the costs incurred in drafting its response to ATM's motion to compel. In its reply brief, ATM argues that Charter's motion for protective order is moot because the parties have entered and the court has approved a confidentiality agreement dealing with any customer information produced by Charter to ATM. The court agrees.

Any legitimate concerns regarding the privacy of the customer information is addressed by the parties' confidentiality agreement entered on March 13, 2006. Furthermore, any issues related to the disclosure of unrelated consumer information is addressed by the fact that only Charter will conduct the search of its own customer

records.    Thereafter,  Charter  will  produce  to  ATM  only  those customer  invoices  or  customer  information  that  comply  with  47 U.S.C. § 551(c)'s disclosure requirements.

With regard to Charter's motion for attorneys fees associated for preparing its response to ATM's motion to compel, the court concludes that the filing of a motion to compel customer invoices and customer information that this court found to be relevant to ATM's claims and damages is not sanctionable conduct.   Therefore, Charter's motion for attorneys fees is denied.


### III. Conclusion

For the above reasons, ATM's motion to compel is GRANTED in part and DENIED in part [Doc. No. 27].   Charter's motions for a protective order and for attorneys fees contained in its response to ATM's motion to compel are both DENIED.[7]


SO ORDERED, this _15th_ day of May, 2006.


_Robert L. Vining, Jr._
ROBERT L. VINING, JR.
Senior United States District Judge


---

[7] On  March  13,  2006,  the  court  entered  a  consent  order extending discovery until May 15, 2006 [Doc. No. 36].  For the sole purpose of allowing Charter to comply with the directives of this order, discovery is extended an additional 50 days.