FILED IN CHAMBERS
U.S.D.C. Rome

NOV 2 7 2006

JAMES N. HATTEN, Clerk
By: _____
                    Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Advanced TeleMedia, L.L.C.,

       Plaintiff,

   v.

Charter Communications, Inc.,

       Defendant.

CIVIL ACTION

NO. 1:05-CV-2662-RLV

O R D E R

This is a breach of contract action, in which the plaintiff also asserts a number of other state law causes of action. This matter comes before the court on a number of motions: the counterclaim defendant's motion for summary judgment on count I of the counterclaim [Doc. No. 79]; the plaintiff's motion for summary judgment on its claims for breach of contract and tortious interference with prospective business relations [Doc. No. 82]; the defendant's motion for summary judgment [Doc. No. 97-1]; the plaintiff's motion to strike defendant's statement of material facts and motion for sanctions [Doc. No. 107-1]; the plaintiff's objection to and motion to strike Charter's Rule 30(e) statement and request for sanctions [Doc. No. 103-1]; ATM's motion for clarification or, in the alternative, motion to compel [Doc. No. 144-3]; the plaintiff's motion to compel Charter to pay expert fees [Doc. No. 160-1]; and Charter's motion for leave to file sur-reply brief in opposition to plaintiff's motion to compel Charter to pay expert fees [Doc. No. 163-1].

In 1998 and 2000, Advanced TeleMedia, LLC ("ATM") and Charter Communications, Inc. ("Charter") entered into five written agreements ("Agreements"). These Agreements dealt with the provision of Charter's cable television service at five metropolitan Atlanta apartment complexes, which include the Berkeley Landing Apartments, Riverbend Apartments, Cumberland Glen Apartments, Wexford Hills Apartments, and Lincoln Trace Apartments (collectively known as "the Properties").

ATM alleges that in 1998 and 2000 it assigned to Charter its license right to provide ancillary services, such as digital cable, premium programming, pay-per-view, and high speed internet to residents of the Properties. However, ATM alleges that it retained the exclusive right to provide basic cable services to the residents of the Properties. According to ATM, ATM paid Charter a monthly service charge per unit in exchange for Charter's obligation to allow ATM to continue as the exclusive provider of basic cable service at the Properties. ATM alleges that during the term of its Agreements with Charter, Charter consistently provided basic cable services to the residents of the Properties in violation of ATM's rights under the Agreements.[1] ATM alleges that

---

[1] On October 14, 2005, ATM filed its complaint. On January 19, 2006, the parties filed a stipulation wherein the parties agreed that ATM would be allowed to file an Amended Complaint. On January 27, 2006, ATM filed its First Amended Complaint. The First Amended Complaint includes eight enumerated Counts. Specifically, ATM alleges that Charter (1) engaged in unauthorized reception of cable service in violation of 47 U.S.C. § 553(A)(1); (2) engaged in unauthorized publication or use of communications in violation of

it incurred damages as the result of Charter's breach of the Agreements with ATM.

I. MOTION FOR SUMMARY JUDGMENT ON THE COUNT I OF THE COUNTERCLAIM

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her claim on which he or she bears the ultimate burden of proof. Id. at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

---

47 U.S.C. § 605; (3) breached its contractual Agreements with ATM; (4) committed fraud; (5) engaged in conversion; (6) tortiously interfered with ATM's prospective business relations; and (7) unjustly enriched itself. Lastly in Count Eight, ATM seeks reimbursement for the expenses incurred in bringing this suit.

case, and on which that party will bear the burden of proof at trial. Id. at 322.

As the counterclaim defendant, ATM moves this court for summary judgment. In Count I of its counterclaim, Charter makes three arguments: (1) ATM breached the Agreements with Charter by failing to pay fees due under those contracts, (2) ATM breached the Agreements by improperly selling or assigning its rights to third-parties, and (3) ATM's breaches caused Charter damages.

A. Riverbend Apartments

The first allegation in Charter's counterclaim is that ATM failed to pay all bulk fees due under the agreement covering cable service to Riverbend Apartments. In support of its motion for summary judgment, however, ATM contends that it did in fact pay all bulk fees owed to Charter for cable service to Riverbend Apartments. The fact at issue in this claim is whether the fees were paid. Notably, in opposition to ATM's motion, Charter does not refute this particular allegation. Instead, Charter admits that ATM has paid all bulk fees owed under the Agreements. Thus, even though both parties essentially agree that the fees for Riverbend Apartments were paid, the complaint states otherwise.

Charter's demand is for only $684.06, the costs it incurred for paying a collection agency to collect bulk fees owed by ATM. In other words, Charter is merely seeking compensation for the cost of using a collection agency to force ATM to pay the fees; it is

4

not actually suing for the unpaid fees because ATM did eventually make payment.

In this case, the allegation of not paying all fees due under the agreement cannot logically apply to the costs incurred as a result of collecting those fees (i.e., the complaint merely asserts that ATM is in breach for failing to pay fees, not that ATM should be responsible for the cost of using a collection agency to enforce ATM's performance). What Charter argues in its memorandum is different than what it alleges in its complaint. Consequently, because there is no dispute as to whether ATM paid fees due under the agreement, entry of summary judgment against Charter on this part of its complaint is required.

B. Lincoln Trace and Berkely Landing Apartments

The second allegation in Charter's counterclaim is that ATM breached the Agreements when it sold or assigned its rights to third-party cable television providers. This allegation centers on ATM's actions regarding the Lincoln Trace and Berkeley Landing Apartments.

Charter's claim regarding the Lincoln Trace agreement is that ATM was in breach for terminating the agreement prior to its expiration. Without expressly admitting that it breached the agreement as alleged, ATM argues that it settled this dispute by paying $111,077.77 to Charter, and consequently that that settlement discharged Charter's claims regarding ATM's actions with the Lincoln Trace agreement. In essence, ATM asserts an

affirmative defense of accord and satisfaction, claiming that regardless of whatever dispute existed regarding the early termination of the Lincoln Trace agreement, the settlement agreement between the parties is the new agreement, and that agreement has since discharged any claims Charter may have had. In response, Charter argues that the payment was only a "partial payment," not a settlement, and that it is entitled to the remaining amount of damages, $11,703.65, caused by the early termination.

However, Charter's own exhibits belie its position. In support of its "partial payment" theory, Charter points to correspondence between the director of operations for Charter and the president of ATM. This evidence makes it clear, though, that when Charter learned of the early termination by ATM, Charter objected and demanded money damages as part of a "settlement." [Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. on Count I of the Countercl., Doc. No. 112, Ex. V] ["Resp. to Mot. for Summ. J. of the Countercl."][2] Charter's own evidence, which is undisputed by ATM,

_____

[2] The citation provided in Charter's response to ATM's motion is actually to "Exhibit V attached to the "Charter Statement of Facts," which is Charter's abbreviation for "Defendant's Statement of Facts Regarding Count I of its Counterclaim of Which There Is a Genuine Issue of Trial." Unfortunately, there is no such document in the record. Also, the court cannot assume that the citation is in reference to the statement of facts submitted by Charter along with its response because that document is styled differently and does not have any exhibits attached. [See Doc. No. 111.] However, Charter's memorandum response in opposition to this motion does include attached exhibits that seem to correspond to Charter's citations even though it, too, is styled differently than its apparent reference. Therefore, this court will look to these

shows that Charter initially made a settlement demand of $120,000, but when rebuked by ATM, the "request for settlement" was reduced to $111,077.07, which ATM then paid.  [Id.; Resp. to Mot. for Summ. J. of the Countercl. Ex. W.]  Thus, the parties do not dispute that ATM paid Charter to settle its complaint regarding the early termination of the Lincoln Trace agreement.  Indeed, the statements of fact by both parties assert that ATM paid Charter the money damages it had demanded in settlement for early termination by ATM. [Countercl. Def.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. on Count I of the Countercl., Doc. 87, ¶ 12; Def.'s Resp. to Pl.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. on Count I of the Countercl., Doc. 111, ¶ 12.]

Although Charter's complaint alleges that ATM improperly terminated the Lincoln Trace agreement by selling its rights to a third-party, the statement of facts and memorandum submitted in support of its position actually argue something different. Charter's argument, apparently in the alternative, is that while there may have been a settlement in place, ATM breached that agreement by bringing claims against Charter subsequent to the settlement and thus Charter is now free to resume pursuing any claims it could have previously made before the agreement was in place.  However, Charter's arguments again stray outside of the complaint and go beyond the issue before this court.  The complaint does not allege a breach of the settlement agreement, it claims

submissions by Charter for its cited support.

only a breach of the Lincoln Trace agreement, and that is what is properly before this court.

Keeping this in mind with regard to the Lincoln Trace agreement and the motion for summary judgment, this court must look only to whether Charter has presented a genuine issue of material fact. Rhone v. State Auto Mut. Ins. Co., 858 F.2d 1507, 1512 (11th Cir. 1988). The complaint asserts that ATM was in breach by selling its rights prior to termination of the agreement. However, the facts presented by both parties clearly show that Charter's claim against ATM was settled for $111,077.07. The acceptance of this settlement payment constituted an accord and satisfaction of Charter's claim as a matter of law. See id. Accordingly, there is no genuine issue presented for trial because Charter is bound by that agreement and may not seek any further damages for ATM's early termination.

On the other hand, Charter's claim regarding the Berkeley Landing agreement apparently arises out of an allegation that ATM sold its rights under that agreement to a third-party and that such sale, i.e. assignment, constituted a breach. ATM argues that Charter has not pointed to any evidence showing the existence of an assignment, and that even if an assignment occurred it was not prohibited by the agreement. While that particular statement may be true, this court need not make that determination.

Notwithstanding the paucity of evidence cited by Charter in support of its argument, there is no genuine issue for trial with

8

regard to the Berkeley Landing agreement.  Paragraph sixteen of the agreement specifically binds "the parties hereto and their respective successors and assigns." [Resp. to Mot. for Summ. J. of the Countercl., Doc. No. 112-3, Ex. E, ¶ 16.]  There is no other provision of the agreement addressing or limiting the rights of either party to assign its rights to third-parties.  Consequently, even if Charter has presented evidence to that effect, such action would not constitute a breach as a matter of law.  There is nothing in the agreement limiting or prohibiting ATM from assigning its contractual rights; thus, Charter's complaint alleges conduct that is not prohibited.  Therefore, Charter has failed to present an issue for trial with regard to the Lincoln Trace and Berkeley Landing agreements, and summary judgment against Charter is appropriate.  Because this court concludes that Charter has failed to present a genuine issue of material fact with respect to its first two claims, this court need not address Charter's third claim, which was simply for damages arising out of the alleged breaches.

## II. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT III AND VI OF ATM'S FIRST AMENDED COMPLAINT

ATM's other motion for summary judgment relates to its claims for breach of contract, Count III, and tortious interference with prospective business relations, Count VI.  ATM's argument is that it is entitled to summary judgment because Charter admits that it provided basic cable service to residents at one of the five

properties in violation of the Agreements governing cable distribution to those apartments. Accordingly, ATM contends that no material fact remains in dispute as to whether Charter breached the contracts and tortiously interfered with prospective business relations. ATM is only partly correct.

A. Breach of Contract

The breach of contract claim focuses on Charter's actions in providing basic cable service to at least some tenants of the five apartment complexes covered by the Agreements. ATM alleges that the Agreements obligated Charter to provide cable service to only a "central demarcation point," where ATM would then be solely responsible for distribution of the basic cable service to individual residents. ATM claims that summary judgment is warranted because whether Charter directly provided basic cable service is not in dispute since Charter admits this allegation. Therefore, the only remaining task is to determine whether that conduct breached the Agreements.

To begin with, the court notes that the evidence in the record clearly shows, and Charter does not dispute, that it has provided basic service to at least some apartment residents. Significantly, the only matter that the two parties do dispute is whether Charter's actions constituted a breach or were otherwise excused. Therefore, in consideration of the summary judgment motion, this court concludes that there is no dispute as to whether Charter provided basic cable service directly to some residents; therefore,

this court may properly proceed to consider whether that conduct constituted a breach of the Agreements.

Interpreting whether Charter's conduct breached the Agreements is a matter of law. Kohlheim v. Glynn County, 915 F.2d 1473, 1480 n.33 (11th Cir. 1990). The provision at issue is common to all of the Agreements; it requires Charter to provide cable signals to ATM's cable television system at each of the apartment complexes. [Pl.'s Mem. of Law in Supp. of Its Mot. for Summ. J. on Its Claims for Breach of Contract and Tortious Interference with Prospective Business Relations, App. 2.]["ATM Mot. for Summ. J."] The four Agreements drafted in 2000 have identical language that specifies the parties' obligations: "[Charter] shall deliver to a mutually agreed demarcation point the [cable] SERVICES . . . . [ATM] shall be responsible for all distribution from that point." Id. The one agreement drafted earlier in 1998 does not contain that exact language, but it nevertheless grants only to Charter the right to use ATM's easements in order to deliver "cable signals to [ATM's] cable television system on the PREMISES." Id. This limited use of the easements is repeated in the later four Agreements also. In all cases, the face of the contracts clearly show Charter's intent to deliver a basic cable signal to only a central point where ATM then assumes the sole responsibility for distribution to residents. Accordingly, the Agreements all make clear that ATM, and not Charter, has the sole right to distribute cable to the residents.

The contracts are equally clear that ATM is not restricted to one particular method of distribution. Charter claims that ATM first breached the Agreements by providing basic cable service for sale to the residents instead of distributing it gratuitously or as an amenity. While this may have been Charter's understanding of how ATM would conduct its business, Charter has not directed this court to any provision, and this court has found none, that expressly restricts ATM from reselling the basic cable service. In contrast, the Agreements do expressly state that the purpose of delivering the cable signals to ATM's cable television station is for distribution by ATM. Because there is no restriction on how ATM was supposed to distribute that basic cable, this court will not impose one.

In defense of its actions, Charter claims that its "minimal billing errors" should not amount to a material breach of the Agreements because it refunded the money that was charged to the residents for basic cable service. However, this argument misses the point. Remedying any error committed against the apartment residents does not redress a breach of the Agreements with ATM. Refunding money to residents, while commendable, does not make ATM whole.

The Agreements clearly show the obligations of each party. Charter was to provide the basic cable signal to a central point, and ATM was to distribute that signal to the residents. Neither party was permitted to do the other's job. Because Charter has

admitted to providing basic service to at least some residents, it infringed on the right that was solely ATM's. Accordingly, this court concludes that Charter breached the Agreements and that summary judgment in favor of ATM is proper. Notably, this does not end the inquiry on this count. The parties still dispute the exact number of breaches by Charter and the total amount of damages. This court makes no conclusion as to either of those elements.

B. Tortious Interference with Prospective Business Relations

ATM's tortious interference claim, on the other hand, does not warrant summary judgment. Although a tortious interference claim is not necessarily incompatible with a breach of contract claim, O.C.G.A. § 9-2-4, generally parties to a contract cannot tortiously interfere with their own agreement. See, e.g., Tom's Amusement Co. v. Total Vending Services, 243 Ga. App. 294, 296-297 (2000).

ATM's argument is that Charter tortiously interfered with ATM's prospective business relations by servicing those residents who were not, but could have been, ATM customers. The problem with ATM's argument is that it claims Charter interfered with ATM's prospective customers by installing basic service for those residents. This particular act of interference is prohibited under the Agreements, and thus Charter's act of installing basic service for any resident is a breach of the Agreements, not a tortious interference.

If the residents whom Charter contacted were members of other apartment communities not solely or exclusively served by ATM, then

13

maybe there could be a separate tortious interference claim. However, in this case both of ATM's claims, the breach of contract claim and the tortious interference claim, focus on Charter's act of establishing service directly to residents at the apartments covered by the Agreements. All of the "potential clients" at issue in this claim, therefore, were residents over which ATM already had the exclusive right to provide service; thus any service provided to those residents was in violation of the Agreements and not a tortious interference. Consequently, summary judgment in favor of ATM on this claim is not warranted.

III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Charter moves this court for summary judgment on all of ATM's claims. This court addresses Charter's arguments regarding each claim in turn.

A. Count I - 47 U.S.C. § 553(a)(1)

ATM's complaint alleges that Charter intercepted and assisted in intercepting ATM's cable signal when Charter provided service directly to residents over ATM's cable system. The pertinent part of 47 U.S.C. § 553(a)(1) states, "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system." The key term at issue is whether ATM's cable television system is a "cable system" governed by section 553(a)(1). In its motion, Charter argues that ATM does not provide cable service over a "cable system" as defined by the statute and, therefore, ATM's claim must fail.

14

The term "cable system" is defined by 47 U.S.C. § 522(7). Charter argues that while ATM's system may initially appear to fit squarely within the definition, the statute's private cable exemption applies and ATM's cable television station is exempt from protection under the statute.   Section 522(7)(B) provides:

> The term "cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include . . . (B) a facility that serves subscribers without using any public right-of-way.

Thus, Charter argues that because ATM's system is a private system and does not utilize a public right-of-way to provide cable service, ATM's cable system falls under the private use exemption. Consequently, ATM's system is exempt from protection under section 553(a)(1), and ATM's claim under this statute must fail.

In response, ATM claims that the private use exemption does not apply in this case.  ATM asserts that it actually does deliver its cable service over lines covering public rights-of-way because it delivers the signal over traditional cable systems instead of via satellite.   The only basis for this assertion is ATM's statement that it provides cable "by means of coaxial cables that physically connect the cable operator with the subscriber and that generally are laid under city streets or along utility lines." [Pl.'s Resp. in Opp'n to Charter's Mot. for Summ. J. 25.]  As legal support for its proposition that the private use exemption does not

apply to ATM's private cable system, ATM cites an Eighth Circuit case, Guidry Cablevision v. City of Ballwin, 117 F.3d 383 (8th Cir. 1997), which  held that the statutory exemption does not apply to a satellite cable system whose lines merely cross under a public street and do not in any other way use a public right-of-way.

Unfortunately, there are no Eleventh Circuit cases, or any other circuit for that matter, addressing this issue. Nevertheless, the reasoning of the Eighth Circuit in Guidry Cablevision is sound.  In citing this case, ATM suggests that the court's decision was framed by the conclusion that the private use exemption was intended only to cover *satellite* cable systems such as DirecTV, and that because ATM does not operate a satellite cable system, the private use exemption should not apply to ATM. However, a fair reading of the court's decision shows that the analysis instead focused on the extent to which a cable system "uses" public rights-of-way.  It is this interpretation of the Eighth Circuit's decision that causes this court to adopt that court's reasoning to the instant case.

In Guidry Cablevision, the court noted that the statute permits local regulation of cable companies that "use" a public right-of-way in such a manner that a cable operator makes "extensive use of public rights-of-way" such as laying cable "under city streets or along utility lines," but that merely crossing or passing over such a right-of-way is not sufficient. Id. at 385-86. Thus in the Eighth Circuit's view, the private use exemption was

16

intended to exempt only cable operators who do not make "extensive" use of public rights-of-way, such as the operator in <u>Guidry Cablevision</u>, who merely had a line cross a public road.

Accordingly, the issue before the court as to Count I of the first amended complaint is the extent to which ATM's cable system utilizes public rights-of-way. Although ATM claims that its system is a "traditional cable system" that uses cables to physically connect with its customers and, therefore, the exemption is not applicable, the facts that ATM has presented on its own behalf in this case tell a different story. In looking at the undisputed facts as to the nature of ATM's cable system and in determining whether the private use exemption of Section 522(7)(B) applies, this court adopts the approach taken by the Eighth Circuit in <u>Guidry Cablevision</u>, which analyzes the extent of a cable system's use of public rights-of-way.

At the outset, this court recognizes that the cable system at issue in <u>Guidry Cablevision</u> was a "satellite" cable system unlike ATM's system in this case. Also, this court will assume *arguendo* that the private cable exemption in section 522(7)(B) was directed primarily at those satellite cable systems and not necessarily at systems such as ATM's that are more traditional, in which the cable signal is sent via wire. However, the basis of that court's reasoning rested on whether the cable system in that case "used" a public right-of-way in such a way as to fall outside of the private use exemption, not whether the system was a *satellite* system.

17

Moreover, the subject of the dispute was not *how* Guidry Cable distributed the signal (i.e. whether it was via satellite), but rather the fact that it had a transmission line that crossed under a public street in order to serve separate parts of a commonly-owned apartment complex.

In Guidry Cablevision, 117 F.3d at 385-86, the court found that although Guidry's cable system crossed under a public street in order to serve all of a commonly-owned apartment complex, that "use" of the public right-of-way was not substantial enough to qualify as a "use" under the statute, and thus Guidry's cable system fell within the private use exemption.  In that case, Guidry Cable had obtained the necessary permits and had paid for the cost of laying its cable under the public street, and the purpose of crossing public property was not to serve subscribers outside of the apartment complex.  Also, the City of Ballwin neither benefitted from the cable distribution nor rendered any service to Guidry Cable, such as allowing use of utility corridors. Therefore, the court concluded that merely crossing a public thoroughfare was not a "use" of a public right-of-way under the private use exemption of Section 522(7)(B).  To put this in context, the court noted that a "use" of a public right-of-way is usually by the type of system that delivered cable service to customers through use of cable wire laid under city streets and along utility lines throughout municipalities in order to avoid the

18

necessity of otherwise seeking easements from the many different private property owners along the path of the cable lines.

In this case, there is no evidence that ATM's cable system crosses any public street.  What is clear is that ATM's systems at each of its apartment complexes operate from a central demarcation point to a resident's individual home unit. [ATM Mot. for Summ. J. App. 1-2.] Both the agreements between ATM and the property owners, and the agreements between ATM and Charter, show that ATM's cable system at each of the five properties operated as an isolated system serving only the residents at those properties respectively.[3]  The reception and distribution of cable throughout ATM's cable system at each of the properties was independently completed on private property.  Id.

There are no facts showing that ATM's systems ever "use" any public right-of-way.  The undisputed evidence before the court instead shows only a private cable system operated by ATM at each of the Properties subject to the Agreements.  Even if that were not the case, the fact remains that ATM's cable system was designed to serve only a specific group of customers contained wholly within a private community.  Thus, any actual crossing or "use" of a public right-of-way in order to render service to all residents within that community would certainly be no more substantial than that in

---

[3]Notably, a number of the agreements between ATM and the property owners refer to ATM's system as a "Private Cable System" that is confined to operating a cable system—regardless of the distribution medium (i.e. satellite or otherwise)—on and through only the subject private property. [ATM Mot. for Summ. J. App. 1.]

Guidry Cablevision, which still fell within the private use exemption.  Accordingly, this court concludes that the private use exemption applies and that ATM's cable system is not a "cable system" as defined by section 522(7)(B).  Therefore, ATM cannot bring a claim under section 553(a), and summary judgment in favor of Charter as to Count I is proper.

B. Count II - 47 U.S.C. § 605(a)

The second count of ATM's first amended complaint alleges that Charter committed cable theft by intercepting and publishing ATM's cable signal in violation of 47 U.S.C. § 605(a).  Charter seeks summary judgment on this claim asserting that section 605(a) does not apply to the type of cable theft alleged.

In support of its argument, Charter points to Scientific-Atlanta Inc. v. Fenley, No. 1:95CV1584-JEC, 1997 WL 33543688 (N.D.Ga. Jan. 14, 1997).  In Scientific-Atlanta, Judge Carnes examined the applicability of section 605(a) to the theft of cable through descrambling devices.  At issue in that case was whether section 605(a) applied to both the theft of cable signal accomplished by intercepting the signal sent to subscribers over a cable network as well as theft accomplished by intercepting a satellite signal through the air.  Judge Carnes recognized the existence of a circuit split on this issue, and the silence of the Eleventh Circuit.  After a thorough discussion of the opposing conclusions by the Seventh and Second Circuits,  Judge Carnes adopted as the "better rule" the Seventh Circuit's "commmon sense

interpretation of section 605's plain language," and found that section 605 does not apply to theft of cable signal sent over ground-based networks.   Scientific-Atlanta, at *11 (quotations omitted).[4]

After carefully considering Judge Carnes' analysis of the issue, this court agrees that the better rule is the one stated by the Seventh Circuit: "cable television programming transmitted over a cable network is not a 'radio communication' as defined in § 153(b), and thus its unlawful interception must [not] be prosecuted under . . . [section] 605." United States v. Norris, 88 F.3d 462 (7th Cir. 1996); accord CSC Holdings, Inc. v. Kimtron, Inc., 47 F. Supp. 2d 1361, 1364 (S.D.Fla. 1999).   Applying that rule to this case, this court holds that section 605(a) is not applicable to the type of cable theft allegedly done by Charter.   Therefore, ATM's claim must fail, and summary judgment for Charter as to Count II is proper.

C. Count III - Breach of Contract

As discussed above, ATM is entitled to summary judgment as to count III of the first amended complaint.   Consequently, Charter's motion for summary judgment on count III is denied.

D. Count IV - Fraud

---

[4] This court notes that although ATM correctly states that Charter argues without relying on binding precedent, ATM does exactly the same thing by pointing to the other side of the split—the Second Circuit's decision in International Cablevision, Inc. V. Sykes, 75 F.3d 123 (2d Cir. 1996).   Consequently, ATM's argument is unhelpful in resolving whether section 605(a) is applicable.

21

Because ATM does not oppose Charter's motion on this claim, this court grants summary judgment in favor of Charter as to count IV.

E. Counts V, VI, and VII - Conversion, Tortious Interference with Prospective Business Relations, and Unjust Enrichment

These claims are asserted by ATM as alternative theories to its breach of contract claim. Because this court has granted summary judgment in favor of ATM on the breach of contract claim, the court need not address the alternative theories of recovery. ATM has made clear to this court that any contract damages will make ATM whole. [ATM's Reply in Further Supp. of ATM's Mot. for Summ. J. on Counts 3 and 6 of its Compl. 13 n.9.] Accordingly, this court grants summary judgment in favor of Charter on counts V, VI, and VII.

F. Count VIII - Expenses of Litigation

Because this court has granted summary judgment as to count III of ATM's first amended complaint, summary judgment in favor of Charter on count VIII, for litigation expenses, is not proper.

IV. PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S STATEMENT OF MATERIAL FACTS AND MOTION FOR SANCTIONS

ATM moves this court to strike Charter's statement of material facts of which there is no genuine issue to be tried, which was filed with Charter's motion for summary judgment. ATM also moves this court to impose sanctions on Charter for submitting arguments and making unsupported factual assertions in its statement of

22

facts.   Although ATM's arguments in support of its motion do not lack merit, this court denies these two motions.

V.   PLAINTIFF'S OBJECTION TO AND MOTION TO STRIKE CHARTER'S RULE 30(e) STATEMENT AND REQUEST FOR SANCTIONS

In this motion, ATM asks the court to strike Charter's Rule 30(e) statement regarding Audra Faith Collins Moody's 30(b)(6) deposition testimony given May 4, 2006.  ATM argues that Charter's Rule 30(e) statement is, among other things, contradictory to previous testimony and should be disregarded because it is merely an attempt to avoid summary judgment on count I of the counterclaim.   However, since this court has decided to grant summary judgment against Charter on count I of its counterclaim, this claim appears to be moot.   Even so, to the extent that the Rule 30(e) statement raises questions about the proper amount of damages, that issue has not been decided yet in this case, and this court does not find the statement to be so inconsistent as to warrant granting ATM's motion.

ATM's argument in this regard is based on the sham affidavit rule, which states that an affidavit submitted solely for the purpose  of opposing a motion for summary judgment must be disregarded when it directly contradicts deposition testimony. McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003); See also  Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987) ("[A] party cannot give clear answers to unambiguous questions in a deposition and thereafter raise an issue

of material fact in a contradictory affidavit that fails to explain the contradiction.") (internal quotations omitted) (citing <u>Van T. Junkins and Associates v. U.S. Industries, Inc.</u>, 736 F.2d 656, 657 (11th Cir. 1984). When an affidavit is contradictory to the extent that it is "inherently inconsistent" with deposition testimony, a court should disregard that affidavit as a sham and exclude it from the evidence considered in a motion for summary judgment. <u>Rollins</u>, 833 F.2d at 1530; <u>Lane v. Celotex Corp.</u>, 782 F.2d 1526, 1531 (11th Cir. 1986). At issue in this motion is Charter's Rule 30(e) statement by Audra Faith Collins Moody that attempts to clarify her deposition testimony. Thus, this court must determine whether Ms. Moody's affidavit is so "inherently inconsistent" with her previous deposition testimony that it constitutes a sham and should be disregarded.

At the outset, this court notes that the Eleventh Circuit has cautioned against application of the sham affidavit rule because of the harsh effects it can have on a party's case. The inconsistencies between the deposition and the affidavit must be substantial because not every discrepancy will justify a court's refusal to consider the contradictory evidence. <u>E.g.</u>, <u>Lane</u>, 782 F.2d at 1530 ("In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition."). When the discrepancies between a deposition and an affidavit create issues of credibility, those are issue more

24

properly left for the factfinder and not a court considering summary judgment. <u>McCormick</u>, 333 F.3d at 1240 n.7; <u>Lambert v. Independent Life and Accident Insurance Co.</u>, 994 F. Supp. 1385, 1389 (M.D. Al. 1998).

In light of the Eleventh Circuit's guidance, and after reviewing the differences between Ms. Moody's deposition and her subsequent Rule 30(e) affidavit, this court concludes that any discrepancy between the two are primarily issues of credibility and, therefore, more properly left to the jury for a determination of damages.  Accordingly, ATM's motion to strike the Rule 30(e) statement and request for sanctions is denied.

VI.  MOTION FOR CLARIFICATION OR, IN THE ALTERNATIVE, MOTION TO COMPEL

At issue in this motion is the information produced by Charter in response to this court's May 15, 2006 order.  In that order, this court instructed Charter to "produce the customer invoices for the period between October 2002 and January 2003 for the Properties in question." [May 15 Order, 9.]  In response, Charter produced 20 CD-ROM discs.  ATM alleges in its motion that the 20 CD-ROM discs were essentially a "data-dump" by Charter and that although the relevant information is likely contained somewhere on those discs, there is so much irrelevant information the data is of little use. Therefore, according to ATM, this court should allow ATM to use a data extrapolation method to ascertain damages for this more recent time period, a method that has already been approved only to

25

calculate damages for an earlier time period.  Alternatively, ATM requests that this court compel Charter to produce customer invoices related only to the Properties for this more recent time period, October 2002 to January 2003.  Because this court can find no appropriate reason to reconsider its earlier determination that the customer invoices for this period are relevant to ATM's claims and because this court finds that these invoices can be produced without unduly burdening Charter, this court denies ATM's motion for clarification but grants ATM's alternative motion to compel.

The central argument for ATM is that the data in the CD-ROM discs is not in a searchable format and that by providing such a voluminous amount of information Charter has failed to comply with the May 15 Order.  ATM's suggested resolution is to forego the detailed information ordered to be produced by this court in favor of permitting ATM to calculate the damages based on an extrapolation method previously limited to a time period in which the customer records are only on microfiche.  Thus, ATM has requested permission to either use the extrapolation methodology to calculate all damages or, in the alternative, to compel Charter to comply with the May 15 Order.

In response, Charter claims that the data it has provided is in the only format available and that the data is in fact in a "searchable format."  Significantly, in rejecting ATM's allegations, Charter asserts that the data contained within the 20 CD-ROM discs is not in a useless format because "[e]ach CD-ROM

contains a software program that allows character searching (i.e. searching by letter, word, or numbers)." [Charter Comm. Inc.'s Br. in Opp'n to Pl.'s Mot. for Clarification or in the Alternative Mot. to Compel 8.]  Moreover, Charter makes it clear that finding the relevant information is feasible since the discs contain "invoice records, arranged alphabetically and searchable by letter, numbers or other characters thereby allowing searching by customer name or customer address.  The invoice records contained on the Cd-ROMs includes customer names, addresses, types of service and payment." [Id. at 9.]

Accepting Charter's argument, this court can find no reason why Charter should not produce the specific information ATM has requested.  Previously, Charter had objected to production of the CD-ROMs because it would unduly burden Charter and risk disclosing confidential customer information.  In the May 15 Order, this court instructed Charter in such a way as to mitigate those concerns. Charter was to produce "customer invoices *for the period between October 2002 and January 2003 for the Properties in question* to ATM."  [May 15 Order, 9][emphasis added.]  A review of the evidence before this court clearly indicates that the information provided to ATM contained customer data for not only the Properties between October 2002 and January 2003, but also a significant amount of data unrelated to these specific parameters.  Notably, this court's decision in the May 15 Order was based on two mitigating factors: (1) a joint confidentiality agreement mooting Charter's concerns

regarding possible 47 U.S.C. § 551 violations, and (2) Charter was to conduct a search of its own records.  However, Charter did not search its own records and instead simply produced all of the information available regardless of whether it fell within the limits set by this court.

Charter has argued that the information provided in the 20 CD-ROMs is in a searchable format.  Accordingly, this court can see no reason why Charter cannot comply with this court's May 15 Order and search its own records to produce customer invoices for the relevant time period and for the properties in question.  Producing extraneous information that falls outside the parameters set by this court is not compliance.  Therefore, Charter is again directed to produce only the relevant information.  Charter is to search the information on the 20 CD-ROMs and provide to ATM the customer invoices for the period between October 2002 and January 2003 for the five properties in question within 30 days of the date this order is docketed.  Also, the parties are directed to agree on a reasonable format for the data, given the admittedly limited file type this particular data is stored on.  If the parties fail to comply with this order, the court will conduct a hearing on the matter in order to determine the appropriate course of action.

VII. PLAINTIFF'S MOTION TO COMPEL CHARTER TO PAY EXPERT FEES

This motion addresses the reasonableness of the fee charged by ATM's expert, Karen Fortune, for responding to Charter's discovery requests and testifying at a deposition.  ATM's moves this court to

compel Charter to pay the full amount billed, while Charter argues that the fee charged is excessive and, thus, unreasonable.

Rule 26(b)(4)(C) provides for assessment of experts fees during discovery: "Unless manifest injustice would result, . . . the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision." The issue before the court is whether the fees assessed by ATM's expert are "reasonable." There is only one case in this circuit, an unreported district court opinion, addressing the issue; and, there is just a handful of reported and unreported cases in other circuits.

In Putnal v. The Guardian Life Insurance Co., 2005 WL 3532381 (M.D. Ga. Dec. 22, 2005), the district court addressed the reasonableness of an expert's fees. A court may consider several criteria in determining a "reasonable" fee:

> (1) the witness' area of expertise; (2) the education and training that is required to provide the expert insight which is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the fee actually being charged to the party who retained the expert; (6) fees traditionally charged by the expert on related matters; (7) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26.

Putnal, at *2. In light of these criteria, this court concludes that some of the Ms. Fortune's fees are unreasonable.

Charter's argument is that (1) the amount of Ms. Fortune's hourly fee is unreasonable, (2) it is unreasonable to charge for

time spent in preparation for the deposition, (3) it is unreasonable to charge for associate's time, and (4) it is unreasonable to charge for deposition time not actually spent testifying at a deposition.

First, this court considers the amount of the fee. As the court in Putnal noted, the "reasonableness" of a fee is determined based on objective standards, not whether the particular expert's fee is reasonable for them. Charter argues that ATM hired an overqualified expert given the task required of her. Further, Charter attempts to illustrate the unreasonableness of Ms. Fortune's fee by comparing her to Charter's expert, who is a statistician instead of an accountant.

However, the $325 fee charged by Ms. Fortune is the standard fee assessed by her and others in her firm. [Pl. Mot. to Compel Charter to Pay Expert Fees, Doc. No. 160-10, Ex. 8, ¶10.] Also, Charter was apparently aware of Ms. Fortune's rate before conducting a deposition (a fact that Charter does not deny), and it did not object to her rate prior to tendering payment at an arbitrarily lower rate. Weighing these facts along with the criteria listed above, this court finds Ms. Fortune's fee of $325 to be reasonable.

Second, Charter argues that regardless of how much time is required of an expert to respond to discovery requests and prepare for a deposition, it is unreasonable for an expert to charge for that time. However, the plain language of the rule weighs against

Charter's interpretation. Rule 26(b)(4)(C) requires "a reasonable fee for time spent in responding to discovery under this subdivision." Thus, the plain language of the rule requires compensation for preparation time as well as time spent testifying at a deposition because all of it is time spent "responding." See United States v. Silva, 43 F.3d 795, 798-99 (11th Cir. 2006)(interpreting a statute should be done in a manner consistent with its plain language). The court in Putnal also found that an expert may charge a fee under Rule 26 for the time spent preparing for a deposition because "it is reasonable [the expert] would need to review his files to ready himself." Putnal, at *3. Therefore, the time Ms. Fortune spent responding to Charter's discovery requests and preparing for her deposition may be charged according to her usual fee.

Third, Charter claims that it is unreasonable for Ms. Fortune to charge for her associates' time in addition to her own. Again looking to the plain language of Rule 26, the court concludes that there is nothing to indicate that the rule contemplates fees for administrative help by an expert's associates. See Profile Prods., LLC v. Soil Mgmt. Techs., Inc., 155 F. Supp. 2d 880, 887 (N.D. Ill. 2001). Moreover, this court concludes that it is unreasonable to charge for associates' time when that time is not spent performing work traditionally done by an accountant. See Jean v. Nelson, 863 F.2d 759, 778 (11th Cir. 1988). The itemized invoice from Ms. Fortune and her supporting affidavit make it clear that the work

31

performed by her associates in this case was not work traditionally performed by an accountant. Her associates' time was spent navigating databases, reviewing documentation, matching records, and producing documents. Consequently, it is unreasonable to charge for the time spent assisting Ms. Fortune in responding to Charter's discovery requests and preparing for her deposition.

Finally, this court addresses Charter's claim that it is unreasonable for Ms. Fortune to charge a fee for the time spent not actually testifying on the day of her deposition. At issue in this particular claim is the fact that Ms. Fortune has charged Charter for 8 hours spent at the deposition even though her testimony lasted only 4.5 hours. In an attempt to clarify why Ms. Fortune charged for 8 hours instead of 4.5, her affidavit states, "[M]y total time for this day was 8.0 hours. In the morning, I performed a final review of the information, met with [ATM's] counsel briefly and was then deposed." [Pl. Mot. to Compel Charter to Pay Expert Fees, Doc. No. 160-5, Ex.3, ¶12.]

Charter argues that it is unreasonable for ATM's expert to charge for her time conferring with counsel because that is more like preparation for trial and a party should not be forced to pay for the other party's trial preparation. While this court is inclined to agree, the distinction between preparing for deposition testimony and preparing for trial is slight at best. However, there is no need to draw that arbitrary line here. Instead, relying on fundamental statutory construction principles, this

32

court looks to the plain language of Rule 26.   Accordingly, because the rule requires compensation only for "responding to discovery," Fed. R. Civ. P. 26(b)(4)(C), and conferring with counsel is clearly not required in order to accomplish that task, this court concludes that the time spent by Ms. Fortune conferring with ATM's counsel may not be charged to ATM as part of her time spent at the deposition.   Also, this court concludes that the mileage expense (the one fee that Charter does not dispute) is a reasonable fee and must be paid by Charter.

Notably, while Ms. Fortune's invoice and affidavit are quite detailed, the breakdown of time spent on the day of the deposition is not sufficiently detailed to ascertain exactly how much time was spent by Ms. Fortune in preparation for her deposition testimony and how much time was spent conferring with counsel.   Therefore, prior to Charter remitting payment, ATM is directed to submit a revised invoice itemizing only the time spent by Ms. Fortune responding to Charter's discovery requests and preparing for her deposition, traveling to her deposition, and testifying at her deposition.

The associated motion by Charter requesting leave to file a sur-reply brief regarding ATM's motion in this matter is denied.

<u>Conclusion</u>

In summary, this court's decision on each motion is as follows:

1.  The counterclaim defendant's motion for summary judgment on Count I of the counterclaim [Doc. No. 79] is GRANTED.

2.  The plaintiff's motion for summary judgment on its claims for breach of contract (Count III) and tortious interference with prospective business relations (Count VI) [Doc. No. 82] is GRANTED as to Count III and DENIED as to Count VI.

3.  The defendant's motion for summary judgment [Doc. No. 97-1] is GRANTED as to Counts I, II, IV-VII of the first amended complaint, and is DENIED as to Count III and Count VIII.

4.  The plaintiff's motion to strike defendant's statement of material facts and motion for sanctions [Doc. No. 107-1] is DENIED.

5.  The plaintiff's objection to and motion to strike Charter's Rule 30(e) statement and request for sanctions [Doc. No. 103-1] is DENIED.

6.  ATM's motion for clarification or, in the alternative, motion to compel [Doc. No. 144-3] is DENIED in part and GRANTED in part. ATM's motion for clarification is DENIED, but the motion to compel is GRANTED.  Charter is directed to search the information on the 20 CD-ROMs and provide to ATM only the customer invoices for the period between October 2002 and January 2003 for the five properties in question within 30 days of the date this order is docketed.

7.  The plaintiff's motion to compel charter to pay expert fees [Doc. No. 160-1] is GRANTED in part.  ATM is directed to submit a revised invoice itemizing only the time spent by Ms. Fortune

responding to Charter's discovery requests and preparing for her deposition, traveling to her deposition, and testifying at her deposition.

8.   The defendant's motion for leave to file sur-reply brief in opposition to plaintiff's motion to compel Charter to pay expert fees [Doc. No. 163-1] is DENIED.

SO ORDERED, this **27ᵗʰ** .day of November, 2006.

_____
ROBERT L. VINING, JR.
Senior United States District Judge

35